UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NICOLE HOFFMAN and
CATHERINE REED,

     Plaintiffs,

-vs-

NUWELL MEDICAL NETWORK LLC,
EPIC HEALTH SYSTEM OF
MICHIGAN LLC, EXCLUSIVE
PHYSICIANS PLLC, ALI KARIM,
GREG NAMAN, and TED NAMAN,
jointly and severally,

     Defendants.

Case No. 21-cv-

Hon.

_____

Jennifer L. McManus  (P65976)
Ryan O. Rosenberg  (P84530)
FAGAN MCMANUS, P.C.
Attorneys for Plaintiffs
25892 Woodward Avenue
Royal Oak, MI  48067-0910
(248) 542-6300
jmcmanus@faganlawpc.com
rrosenberg@faganlawpc.com
_____

## **COMPLAINT AND JURY DEMAND**

There is no other pending or resolved civil action
arising out of the transaction or occurrence
alleged in the Complaint.

NOW  COME  Plaintiffs,  by  and  through  their  attorneys,  FAGAN

MCMANUS, P.C., and for their cause of action against the Defendants, state

1

as follows:

## JURISDICTIONAL ALLEGATIONS

1.     Plaintiff, Nicole Hoffman (hereinafter "Hoffman") is an individual residing in the City of Royal Oak, County of Oakland, State of Michigan.

2.     Plaintiff, Catherine Reed (hereinafter "Reed") is an individual residing in the City of Mount Clemens, County of Macomb, State of Michigan.

3.     Defendant, Nuwell Medical Network LLC (hereinafter "Nuwell") is a for-profit Company and at all times pertinent hereto did conduct business in the County of Oakland, State of Michigan.

4.     Defendant, Epic Health System of Michigan LLC (hereinafter "Epic") is a for-profit Company and at all times pertinent hereto did conduct business in the County of Oakland, State of Michigan.

5.     Defendant, Exclusive Physicians PLLC (hereinafter "Exclusive") is a for-profit Company and at all times pertinent hereto did conduct business in the County of Oakland, State of Michigan.

6.     At all times relevant hereto, Defendants Nuwell, Epic and Exclusive (jointly referred to as the "Medical Entities") operated as joint employers of both Plaintiffs.

7.     At all times relevant hereto, the Medical Entities shared administrative control and jointly governed the essential terms of Plaintiffs'

terms and conditions of employment.

8.     For example, at all times relevant hereto, the Medical Entities shared a human resources department, shared a marketing department, shared management personnel, shared a payroll department and shared overall administrative functions.

9.     Defendant Ali Karim (hereinafter "Karim"), an individual, is the head of Marketing Design and Acquisitions of the Medical Entities, and at all times pertinent hereto did conduct business in the County of Oakland, State of Michigan.

10.     Defendant Greg Naman (hereinafter "Greg") is a founder and Internal Medicine doctor of the Medical Entities, and at all times pertinent hereto did conduct business in the County of Oakland, State of Michigan.

11.     Defendant Ted Naman (hereinafter "Ted") is a founder and Internal Medicine doctor of the Medical Entities, and at all times pertinent hereto did conduct business in the City of Ferndale, County of Oakland, State of Michigan.

12.     This Court has jurisdiction pursuant to 28 U.S.C. §1331 (federal question).

## **GENERAL ALLEGATIONS**

13.     Reed was offered a position with the Medical Entities on October

31, 2019, and began her employment in December 2019, as the Vice President of Human Resources.

14.    While employed with the Medical Entities, Reed's name badge and the letterhead that she was instructed to use contained the Epic name.

15.    While employed with the Medical Entities, Reed's paychecks identified Nuwell as the entity that paid her.

16.    In her role with Human Resources, Reed recruited employees for all of the Medical Entities and was responsible for disciplining employees of all of the Medical Entities.

17.    Among her many duties, Reed was responsible for processing payroll payments for the Medical Entities' employees.

18.    Hoffman commenced her employment with the Medical Entities on March 15, 2019, and last held the position of Marketing Manager.

19.    During her employment, Hoffman performed services for all of the Medical Entities.

20.    During her employment, Hoffman used Epic letterhead and her badge identified her as an Epic employee.

21.    During her employment, Hoffman's paychecks identified Nuwell as the entity that paid her.

22.    Hoffman's job position required her to work closely with Karim,

4

who was adamant about his marketing and advertising strategies.

23.    In February 2020, Reed discovered that there were multiple lawsuits filed against Karim alleging, among other things, fraud and securities fraud issues.

24.    In February 2020, Reed brought this information to Greg's attention, but nothing was done to address the issue.

25.    In March 2020, Reed discovered that Karim was not paying his employees at a company he owned in Arizona that Epic was seeking to take over and had failed supply the employees with 2019 W-2s.

26.    Reed was also informed that Karim was under investigation in Arizona for other illegal conduct.

27.    As a result of her discovery, Reed filed FOIA requests with Arizona's Attorney General and the FBI to further investigate Karim's illegal conduct.

28.    In addition, Reed reported Karim's ongoing illegal conduct in Michigan, some of which is described herein, to both the Arizona Attorney General and the FBI.

29.    In March 2020, Karim directed Reed to process his paychecks without paying taxes and other mandatory withholdings, by changing his payment to a 1099.

30.    Reed protested Karim's instruction because she believed that it was illegal to avoid paying taxes and other mandatory withholdings and also because she believed that doing so would be an illegal misclassification of his employment status as an independent contractor.

31.    Reed refused to process Karim's paychecks without the required taxes and withholdings.

32.    In August 2020, Epic's Director of Finance asked if Reed was paying Epic's Vice President of Operations, Gladys Cortes ("Cortes"), as both a W-2 employee and a 1099 contractor.

33.    Reed stated that such dual payments would be illegal because it would result in the non-payment of required taxes and withholdings and would further be an illegal misclassification of Cortes as an independent contractor and an employee at the same time.

34.    By paying Cortes as a 1099 contractor, Defendants would have illegally avoided paying state and federal payroll taxes and withholdings on that portion of Cortes's compensation.

35.    Reed told the Director of Finance that she would not process any 1099 payments to individuals who were actual employees because she believed that it was illegal to avoid paying payroll taxes and other required withholdings and it was also illegal to misclassify employees as independent

contractors.

*Anti-Kickback Issue*

36.   In October 2020, Defendants began to roll out a plan to use podiatrists to refer patients to the Medical Entities.

37.   Reed protested against this plan to Karim, explaining that this program violated anti-kickback laws.

38.   The same day that Reed protested, Defendants told Reed that she was not being a team player.

39.   Karim insisted that violating these laws required intent to defraud, claimed that Defendants did not "intend to defraud", and thus the referral program was not technically a legal violation.

*Direct Text Advertising of "Covid Cure"*

40.   In mid-October 2020, Karim launched a direct text-message advertisement campaign.

41.   The advertisement campaign would send a text message to Epic's diabetic patients claiming that the patients were at a much higher risk for contracting Covid-19 and advertising that Epic had an U.S. Food and Drug Administration ("FDA") approved treatment for Covid.

42.   Epic did not have an FDA-approved treatment for Covid.

43.   Any claim that Epic had an FDA-approved treatment for Covid

was a lie.

44.    Hoffman reported the proposed text message advertisement campaign to Reed.

45.    Hoffman and Reed believed that sending this text message advertisement was illegal because it was false and misleading, and/or constituted fraud.

46.    Hoffman was instructed by Defendants to use multiple pieces of Personal Identifiable Information within the text message campaign, as the proposed text message identified the person by name and diagnosis over a non-secure method of communication.

47.    Because of the use of the Personal Identifiable Information in the text messages, Hoffman and Reed also believed sending these messages constituted HIPAA violations.

48.    In addition, because Defendants planned to send the text messages via a non-secure method of communication, Hoffman and Reed believed that sending these messages constituted HIPAA violations.

49.    The Medical Entities held a roundtable conference on October 15, 2020.

50.    At the roundtable conference, Hoffman told Karim, in front of the Medical Entities' Department Managers, that sending these messages was

illegal, was false and misleading, constituted fraud, and also violated HIPAA.

51.     Karim insisted the message be sent, as he believed there was a "Covid loophole" that provided the Medical Entities immunity from HIPAA violations.

52.     Reed was not at the roundtable meeting, but still brought her concerns about HIPAA violations and the false and misleading advertisements to Cortes's attention.

53.     Upon Karim's insistence, Hoffman sent a revised version of Karim's text message to patients of Epic on October 15, 2020.

54.     The evening that the text message was sent, Karim demanded that Reed terminate Hoffman's employment for her objections to the illegal text message advertisements.

55.     Karim told Reed that he wanted to hire someone who will just execute orders and do what he says.

56.     The next day, Reed told Karim that she believed that Hoffman's termination was illegal and in retaliation for her objection to Defendants' illegal conduct, but he insisted she carry out the termination.

57.     Hoffman was terminated from her employment on October 23, 2020.

58.     Per prior practice, the Medical Entities' employees are issued

performance improvement plans before termination.

59.    Hoffman had no previous performance issues, negative performance reviews, or performance improvement plans.

60.    Hoffman was terminated for her objections to the illegal text message advertising campaign.

61.    On or about November 2, 2020, Reed met with Greg and raised concerns about Karim's illegal conduct in other states and her uncovering of Karim's fraudulent schemes.

62.    On or about November 2, 2020, Reed again told Greg that she had been in touch with the Arizona Attorney General's Office and the FBI to report and discuss Karim's illegal conduct, and that she had recently received information from the Arizona Attorney General's Office in response to her request for information.

63.    In this conversation, Reed pointed out that this was not the first time she brought Karim's illegal conduct to Greg's attention, but that nothing had been done.

64.    At the time of the conversation, Reed had no previous performance issues, negative performance reviews, or performance improvement plans.

65.    Reed's employment was terminated just days later, on

November 5, 2020.

## COUNT I
## VIOLATION OF HIPAA'S ANTI-RETALIATION PROVISION
## REGARDING HOFFMAN

66.    Plaintiffs incorporate the above paragraphs as if specifically repeated herein.

67.    The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d, *et seq*, provides privacy protections for patients and providers regarding health care information.

68.    HIPAA contains an anti-retaliation provision, 45 C.F.R. § 160.316, which prohibits covered entities under HIPAA from threatening, intimidating, coercing, harassing, discriminating against, or taking any other retaliatory action against any individual or other person for –

   (c) "Opposing any act or practice made unlawful by this subchapter, provided the individual or person has a good faith belief that the practice opposed is unlawful, and the manner of opposition is reasonable and does not involve a disclosure of protected health information..."

69.    At all times pertinent hereto, Epic was a "covered entity" under 45 C.F.R. § 160.103(3), as Epic is "A health care provider who transmits any health information in electronic form…"

70.   Hoffman believed in good-faith that Defendants' text message advertisement campaign violated HIPAA because it used multiple pieces of Personal Identifiable Information and diagnosis information over a non-secure method of communication.

71.   Hoffman acted reasonably when she opposed the text message campaign, in the following ways:

    (a)   Hoffman objected to the text message campaign to Karim and the Medical Entities' Managers;

    (b)   Hoffman sent a revised version of the text message;

    (c)   Other acts of reasonable opposition to be determined through discovery.

72.   Defendants took adverse action against Hoffman for engaging in such opposition as follows:

    (a)   Terminating Hoffman's employment;

    (b)   Other acts of retaliation to be determined through discovery.

73.   The above act(s) of retaliation are a violation of HIPAA's anti-retaliation statute.

74.   As a direct and proximate result of Defendants' retaliatory conduct in violation of HIPAA's anti-retaliation statute, Hoffman has suffered and will in the future suffer damages including, but not limited to:

    (a)   Loss of wages and other forms of compensation, both in

the past and in the future;

(b)    Loss of the value of benefits, both in the past and in the future;

(c)    Loss of promotional opportunities;

(d)    Loss of earning capacity;

(e)    Extreme embarrassment, humiliation, mental anguish, disappointment, outrage and indignity;

(f)    Exemplary damages;

(g)    Other injuries and damages that become known through the discovery process.

WHEREFORE, Hoffman prays for Judgment against Defendants, in whatever amount the Court or Jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, and attorney fees.

## COUNT II
## VIOLATION OF HIPAA ANTI-RETALIATION
## PROVISION REGARDING REED

75.    Plaintiffs incorporate the above paragraphs as if specifically repeated herein.

76.    The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d, *et seq*, provides privacy protections for patients and providers regarding health care information.

77.    HIPAA contains an anti-retaliation provision, 45 C.F.R. §

160.316, which prohibits covered entities under HIPAA from threatening, intimidating, coercing, harassing, discriminating against, or taking any other retaliatory action against any individual or other person for –

(d) "Opposing any act or practice made unlawful by this subchapter, provided the individual or person has a good faith belief that the practice opposed is unlawful, and the manner of opposition is reasonable and does not involve a disclosure of protected health information..."

78.   At all times pertinent hereto, Epic was a "covered entity" under 45 C.F.R. § 160.103(3), as Epic is "A health care provider who transmits any health information in electronic form…"

79.   Reed believed in good-faith that Defendants' text message advertisement campaign violated HIPAA because it used multiple pieces of Personal Identifiable Information and diagnosis information over a non-secure method of communication.

80.   Reed acted reasonably when she opposed the text message campaign, in the following ways:

(a)   Reed objected to sending the text message;

(b)   Reed opposed Hoffman's retaliatory termination;

(c)   Other acts of reasonable opposition to be determined through discovery.

14

81.    Defendants took adverse action against Reed for engaging in such opposition as follows:

    (a)    Terminating Reed's employment;

    (b)    Other acts of retaliation to be determined through discovery.

82.    The above act(s) of retaliation are a violation of HIPAA's anti-retaliation statute.

83.    As a direct and proximate result of Defendants' retaliatory conduct in violation of HIPAA's anti-retaliation statute, Reed has suffered and will in the future suffer damages including, but not limited to:

    (h)    Loss of wages and other forms of compensation, both in the past and in the future;

    (i)    Loss of the value of benefits, both in the past and in the future;

    (j)    Loss of promotional opportunities;

    (k)    Loss of earning capacity;

    (l)    Extreme embarrassment, humiliation, mental anguish, disappointment, outrage and indignity;

    (m)    Exemplary damages;

    (n)    Other injuries and damages that become known through the discovery process.

WHEREFORE, Reed prays for Judgment against Defendants, in

whatever amount the Court or Jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, and attorney fees.

## COUNT III
## VIOLATION OF MICHIGAN'S WHISTLEBLOWER PROTECTION ACT REGARDING REED

84.   Plaintiffs incorporate the above paragraphs as if specifically repeated herein.

85.   Pursuant to MCL 15.362:

"An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally, or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to laws of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by the public body, or a court action."

86.   Defendants are considered an "employer" under the statute.

87.   The FBI is considered a "public body" under the statute.

88.   The Arizona Attorney General's office is considered a "public body" under the statute.

89.   On November 2, 2020 Reed told Greg that she had spoken with the FBI and the Arizona Attorney General's office about Karim's illegal

conduct, and that she had reported ongoing illegal conduct by Karim to both public bodies.

90.     Such conduct by Reed was a protected activity under Michigan's Whistleblower Protection Act, MCL 15.362.

91.     On November 5, 2020 Reed was terminated from her employment.

92.     There is a causal connection between Reed's communication with Defendants that she reported or was about to report Karim's violation of law to the FBI and the Arizona Attorney General's Office, or was involved in an investigation by either of those public bodies, and her termination.

93.     Defendants violated the WPA by retaliating against Reed and taking adverse action against her for engaging in such protected activities as follows:

(a)     Terminating Reed's employment;

(b)     Other acts of retaliation to be determined through discovery.

94.     As a direct and proximate result of Defendants' retaliatory conduct in violation of the WPA, Reed has suffered and will in the future suffer damages including, but not limited to:

(d)     Loss of wages and other forms of compensation, both in the past and in the future;

(e)    Loss of the value of benefits, both in the past and in the future;

(f)    Loss of promotional opportunities;

(g)    Loss of earning capacity;

(h)    Extreme embarrassment, humiliation, mental anguish, disappointment, outrage and indignity;

(i)    Exemplary damages;

(j)    Other injuries and damages that become known through the discovery process.

WHEREFORE, Reed prays for Judgment against Defendants, in whatever amount the Court or Jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, and attorney fees.

## COUNT IV
## VIOLATION OF THE FLSA'S ANTI-RETALIATION STATUTE
## REGARDING REED

95.    Plaintiffs incorporate the above paragraphs as if specifically repeated herein.

96.    The Fair Labor Standards Act ("FLSA") contains an anti-retaliation statute, 29 U.S.C. § 215(a)(3), which makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or

18

has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."

97.   The anti-retaliation provision of the FLSA protects oral as well as written complaints of a violation of the Act.

98.   Further, the anti-retaliation provision of the FLSA can be triggered by complaints made at work to a supervisor.

99.   Defendants instructed Reed to pay Karim as a 1099 employee in order to avoid paying required taxes and withholdings.

100.  Defendants instructed Reed to pay Cortes as a 1099 contractor at the same time Cortes was paid as a W-2 employee.

101.  In both instances, Reed refused to misclassify Defendants' employees as 1099 contractors.

102.  Reed voiced her objections to Karim and the Director of Finance, as she believed them to be illegal violations of the FLSA, and refused to misclassify employees as independent contractors.

103.  Reed's objections to Defendants' instruction that she violate the FLSA and her refusal to violate the FLSA constitute protective activities under the FLSA.

104.  Reed was terminated shortly after her objection to Defendants' instruction that she violate the FLSA and her refusal to violate the FLSA.

105.   Defendants took adverse action against Reed for engaging in such opposition as follows:

    (a)   Terminating Reed's employment;

    (b)   Other acts of retaliation to be determined through discovery.

106.   Defendants' actions were intentional and willful, and were in deliberate disregard of and made with reckless indifference to, the rights and sensibilities of Reed.

107.   There was a causal connection between Reed's protected activities and the adverse employment action of termination.

108.   As a direct and proximate result of Defendants' retaliatory conduct in violation of the FLSA, Reed has suffered and will in the future suffer damages including, but not limited to:

    (a)   Loss of wages and other forms of compensation, both in the past and in the future;

    (b)   Loss of the value of benefits, both in the past and in the future;

    (c)   Loss of promotional opportunities;

    (d)   Loss of earning capacity;

    (e)   Extreme embarrassment, humiliation, mental anguish, disappointment, outrage and indignity;

    (f)   Exemplary damages;

(g)    Liquidated damages;

(h)    Attorneys fees;

(i)    Other injuries and damages that become known through the discovery process.

WHEREFORE, Reed prays for Judgment against Defendants, in whatever amount the Court or Jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, and attorney fees.

## COUNT V
## VIOLATION OF PUBLIC POLICY
## REGARDING HOFFMAN

109.  Plaintiffs incorporate the above paragraphs as if specifically repeated herein.

110.  It is unlawful and in violation of the public policy of the State of Michigan for an employer to discharge or take other adverse action against an employee who refuses to violate the law in the course of her employment, objects to unlawful practices, or acts in accordance with statutory rights or duties.

111.  Defendants planned to send a direct text message advertisement campaign alleged it had an FDA-approved product that was available to treat Covid-19.

112.  Hoffman believed that this text message promotion constituted

fraud because it contained false and misleading claims that Defendants had a product to treat Covid-19 in order to induce diabetic patients' business .

113.   The Michigan Consumer Protection Act, MCL § 445.903, prohibits, among other things, (c), "representing that goods or services have sponsorship, approval ... that they do not have."

114.   Hoffman believed that this text message promotion constituted a violation of the Michigan Consumer Protection Act, because it alleged FDA approval of goods or services that did not actually have FDA approval.

115.   Hoffman opposed and objected to sending the text message campaign to Epic's patients because she believed it to be fraudulent activity and a misrepresentation under the Michigan Consumer Protection Act.

116.   Defendants violated the public policy of the State of Michigan by retaliating against Hoffman and taking adverse action against her for engaging in such protected activities as follows:

(a)   Terminating Hoffman's employment;

(b)   Other acts of retaliation to be determined through discovery.

117. As a direct and proximate result of Defendants' retaliatory conduct in violation of the public policy of the State of Michigan, Hoffman has suffered and will in the future suffer damages including, but not limited to:

(a)   Loss of wages and other forms of compensation, both in

the past and in the future;

(b)     Loss of the value of benefits, both in the past and in the future;

(c)     Loss of promotional opportunities;

(d)     Loss of earning capacity;

(e)     Extreme embarrassment, humiliation, mental anguish, disappointment, outrage and indignity;

(f)     Exemplary damages;

(g)     Other injuries and damages that become known through the discovery process.

WHEREFORE, Hoffman prays for Judgment against Defendants, in whatever amount the Court or Jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, and attorney fees.

## COUNT VI
## VIOLATION OF PUBLIC POLICY
## REGARDING REED

118.  Plaintiffs incorporate the above paragraphs as if specifically repeated herein.

119.  It is unlawful and in violation of the public policy of the State of Michigan for an employer to discharge or take other adverse action against an employee who refuses to violate the law in the course of her employment, objects to unlawful practices, or acts in accordance with statutory rights or

duties.

*Tax Fraud*

120.   In   March   2020,   Karim   instructed   Reed   to   process   payroll payments illegally, by instructing Reed to misclassify Defendants' employees as independent contractors in order to avoid taxes and withholdings.

121.   Reed   objected   to   this   request   because   she   believed   it   to   be illegal.

122.   Defendants violated the public policy of the State of Michigan by retaliating against Reed and taking adverse action against her for engaging in such protected activities as follows:

(a)   Terminating Reeds' employment;

(b)   Other   acts   of   retaliation   to   be   determined   through discovery.

*Direct Text Advertising of "Covid Cure"*

123.   Defendants'   direct   text   message   advertisement   campaign fraudulently alleged it had an FDA-approved product that treated Covid-19.

124.   Reed believed that this text message advertisement campaign constituted   fraud   because   it   used   false   and   misleading   information,   that Defendants   had   a   product   to   treat   Covid-19,   in   order   to   induce   diabetic patients' business.

125.   The   Michigan   Consumer   Protection   Act,   MCL   §   445.903,

24

prohibits, among other things, (c), "representing that goods or services have sponsorship, approval ... that they do not have."

126.  Reed believed that this text message promotion constituted a violation of the Michigan Consumer Protection Act, because it falsely claimed FDA approval of goods or services that did not actually have FDA approval.

127.  Reed opposed and objected to sending the text message campaign to Epic's patients because she believed it to be fraudulent activity and a misrepresentation under the Michigan Consumer Protection Act.

128.  Defendants violated the public policy of the State of Michigan by retaliating against Reed and taking adverse action against her for engaging in such protected activities as follows:

      (a)    Terminating Reed's employment;

      (b)    Other acts of retaliation to be determined through discovery.

*Anti-Kickback Issue*

129.  Under the Federal Anti-Kickback Statute, 42 U.S. Code § 1320a–7b(b), it is a felony punishable by up to five years in prison and a fine of up to $25,000 for a person to knowingly and willfully offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing

of any item or service for which payment may be made in whole or in part under a Federal health care program.

130.  Upon information and belief, Defendants planned to use certain podiatrists to refer patients to Epic.

131.  Upon information and belief, Defendants planned to pay such podiatrists for their referral of patients to Epic.

132.  Reed engaged in protected activity when she voiced her objection to the planned referral program and questioned its legality under the Anti-Kickback laws to Karim.

133.  Defendants violated the public policy of the State of Michigan by retaliating against Reed and taking adverse action against her for engaging in such protected activities as follows:

(a)  Telling Reed that she was not a team player;

(b)  Terminating Reed's employment;

(c)  Other acts of retaliation to be determined through discovery.

134. As a direct and proximate result of Defendants' retaliatory conduct in violation of the public policy of the State of Michigan, Reed has suffered and will in the future suffer damages including, but not limited to:

(a)  Loss of wages and other forms of compensation, both in the past and in the future;

(b)    Loss of the value of benefits, both in the past and in the future;

(c)    Loss of promotional opportunities;

(d)    Loss of earning capacity;

(e)    Extreme embarrassment, humiliation, mental anguish, disappointment, outrage and indignity;

(f)    Exemplary damages;

(g)    Other injuries and damages that become known through the discovery process.

WHEREFORE, Reed prays for Judgment against Defendants, in whatever amount the Court or Jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest, costs, and attorney fees.

Respectfully submitted,

FAGAN MCMANUS, P.C.

By: /s/ *Jennifer L. McManus*
    Jennifer L. McManus (P65976)
    Attorney for Plaintiffs
    25892 Woodward Avenue
    Royal Oak, MI  48067-0910
    (248) 542-6300
Dated:  January 28, 2021    jmcmanus@faganlawpc.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NICOLE HOFFMAN and
CATHERINE REED,

     Plaintiffs,

                                          Case No. 21-cv-

-vs-

                                          Hon.

NUWELL MEDICAL NETWORK LLC,
EPIC HEALTH SYSTEM OF
MICHIGAN LLC, EXCLUSIVE
PHYSICIANS PLLC, ALI KARIM,
GREG NAMAN, and TED NAMAN,
jointly and severally,

     Defendants.

---

Jennifer L. McManus  (P65976)
Ryan O. Rosenberg  (P84530)
FAGAN MCMANUS, P.C.
Attorneys for Plaintiffs
25892 Woodward Avenue
Royal Oak, MI  48067-0910
(248) 542-6300
jmcmanus@faganlawpc.com
rrosenberg@faganlawpc.com

---

## PLAINTIFFS' DEMAND FOR JURY TRIAL

NOW COME the above-named Plaintiffs, by and through their attorneys, FAGAN MCMANUS, P.C., and hereby demand trial by jury in the above matter.

28

Respectfully submitted,

FAGAN MCMANUS, P.C.

By: /s/ Jennifer L. McManus
    Jennifer L. McManus (P65976)
    Attorney for Plaintiffs
    25892 Woodward Avenue
    Royal Oak, MI  48067-0910
    (248) 542-6300

Dated:  January 28, 2021          jmcmanus@faganlawpc.com